HALL, Judge.
Plaintiff, an employee of the City of New Orleans, sued the City of New Orleans, the Sewerage and Water Board of the City of New Orleans, New Orleans Public Service, Inc., Kennedy Valve Company (and its insurer) and R. D. Wood Company, praying for damages ex delicto in the sum of $47,647.00 for personal injuries sustained by him in an accident which occurred on August 1, 1964. In the alternative plaintiff prayed for judgment against the City of New Orleans for workmen’s compensation benefits in the sum of $14,-000.00 (400 weeks at $35.00 per week). The City of New Orleans intervened seeking reimbursement of workmen’s compensation benefits paid by it to plaintiff or for his account.
Prior to trial on the merits plaintiff’s suit was dismissed as to Kennedy Valve Company (and its insurer), New Orleans Public Service, Inc., and R. D. Wood Company, and these defendants passed out of the case.
Following trial on the merits judgment was rendered in favor of plaintiff and against the Sewerage and Water Board of the City of New Orleans in the sum of $18,058.00 and in favor of the City of New Orleans, plaintiff in intervention, in the sum of $2,654.80. The Sewerage and Water Board appealed. Plaintiff answered the appeal praying that the judgment against the Sewerage and Water Board be increased to the sum of $35,000.-00 but since the answer was not timely filed in accordance with LSA-C.C.P. Art. 2133 it will not be considered.
Plaintiff, an employee of the Department of Sanitation of the City of New Orleans, was injured in an accident while working as a laborer in a crew engaged in cleaning and washing down Canal Street. The accident happened about 12:30 A.M. on August 1, 1964 when plaintiff went to connect one end of a hose to a fire hydrant located on the lake side of Burgundy Street about fifteen feet from the downtown lake corner of Canal and Burgundy Streets. As he started to remove the cap from the nozzle to which he intended attaching the hose plaintiff noticed a leak coming from one of the hydrant nozzles. In order to turn the water pressure off so that he might connect the hose without injury to himself by the cap blowing off, plaintiff applied his spanner wrench to the nut on top of the hydrant which operates the on and off valve which is located at the bottom of the hydrant barrel. He was leaning over the hydrant for leverage while turning the valve nut counter-clockwise to the off position when the entire hydrant blew completely out of the ground striking him in the stomach and chest and throwing him into the air with the hydrant. He had turned the valve nut about half a turn before the hydrant blew out. The barrel of the hydrant did not turn and he had no warning that it was loose. There were no witnesses to the accident besides plaintiff.
An emergency crew of the Sewerage and Water Board was summoned to the scene and after the water was shut off the area was excavated and a new hydrant was screwed into the elbow connecting it with the water line. Some members of the re *93 pair crew testified that the old elbow was undamaged and was reinstalled while others testified it was replaced by a new one. Several of the emergency crew noticed that the threads on the old hydrant were mashed. It was their opinion that this damage was caused when the hydrant struck the pavement after blowing out of the elbow. The old hydrant was removed to the Board’s yard where it was repaired and placed in stock. Unfortunately, since the hydrants have no number or other identification, the hydrant which caused plaintiff’s injuries could not be produced in Court for inspection.
Plaintiff charged the Sewerage and Water Board with specific acts of negligence but relies principally on the doctrine of res ipsa loquitur. The Sewerage and Water Board denied any negligence on its part, plead contributory negligence on the part of plaintiff, and in denying the applicability of res ipsa loquitur, based its defense mainly on the assertion that the hydrant had been hit by an unknown vehicle and turned. The Trial Judge based his holding on the doctrine of res ipsa loquitur and the failure of defendant to exculpate itself from fault.
The Trial Judge found the following facts which are amply supported by the record:
“1. The Sewerage & Water Board has control and responsibility in the installing, inspecting and maintenance of fire hydrants in the City of New Orleans.
“2. Fire hydrants are provided for the use of the New Orleans Fire Department and the New Orleans Sanitation Department.
“3. The fire hydrant in question was seated into the elbow or fitting by means of interlocking threads of the hydrant and elbow.
“4. The fire hydrant in question was a 5" hydrant, which means that it had five or six threads; therefore, it would have taken at least five complete revolutions of the hydrant barrel to firmly screw or seat into the elbow. To properly install the fire hydrant in question at least four workers were necessary who would have used iron bars and metal chains in installing the hydrant.
“5. If a fire hydrant is properly installed and seated firmly in the elbow, it is impossible for one man to unscrew the hydrant out of the ground with a spanner wrench. The same number of men and the same equipment would be necessary to unseat a fire hydrant if it was properly seated.
“6. The purpose of the hydrant and elbow threads is to hold the hydrant in place.
“7. To install the hydrant, the hydrant barrel must be rotated in a clockwise direction. To unscrew the hydrant from the elbow, the hydrant barrel must be rotated counterclockwise.
“8. Water is turned on and off by applying a spanner wrench to the operating nut at the top of the hydrant. Only one man is required to turn the on and off valve. Turning the on and off valve has nothing to do with the screwing or unscrewing of the hydrant. The barrel of the hydrant should not rotate when a worker is applying his wrench to the operating nut.”
íhe record reveals that the Sewerage and Water Board has no records concerning the date the hydrant in question was purchased, the date the hydrant was installed nor records of any tests made on the hydrant before or at the time of installation. The earliest record pertaining to the hydrant is a report of December 1, 1961. On that date the hydrant was found leaking and a work crew turned the hydrant a quarter turn clockwise with the use *94 of a six foot steel pole and chains. Mr. Salvador Stabile, foreman of the crew, testified that it appeared the hydrant had been struck by a car although there was no evidence to support such an opinion. The next record is a report dated March 26, 1964. The hydrant was found leaking between the washer and the seat and was again turned a quarter turn clockwise by two men on each side of a six foot pole, with the use of chains. The foreman, Mr. Stabile, again stated that it was his opinion that the hydrant had been struck by a vehicle although there was no evidence to indicate this. The valve nut on top of the hydrant was greased on April 1, 1964 and was not then leaking. The record also reveals that the hydrant had been used by the wash-down crew a night or two before plaintiff’s accident and no one noticed it leaking.
It is noted that all that was done to the hydrant on December 1, 1961 and March 26, 1964, was to screw the hydrant a quarter turn clockwise. Mr. Ben Haney, Principal Assistant Engineer for the Sewerage and Water Board, who was called as an expert witness for the defendant, admitted that if a fire hydrant is struck by a vehicle the hydrant should be thoroughly checked for other damage. He also testified that a fire hydrant is under 1500 pounds of water pressure and is a potentially dangerous piece of equipment especially so if it is unseated.
Mr. Leonard Garretti, a fireman who had been employed by the New Orleans Fire Department for 19 years, testified that on February 25, 1967 while removing his hose from the large nozzle of a fire hydrant on Press and Chartres Streets, the hydrant came completely out of the ground striking and injuring him. The hydrant seemed to him to be in perfect condition and he had no warning whatever. He also testified that on two previous occasions he had had similar experiences.
The record further reveals that if the hydrant in question had been in good condition and properly seated nothing the plaintiff could have done prior to the accident could possibly have caused the hydrant to come out of the ground. It seems probable that the hydrant was either unseated or else parts of the hydrant or elbow were defective. If the hydrant was unseated it could have been caused by improper installation or improper maintenance. If it had been struck on two occasions by a vehicle as Mr. Stabile speculated,' it should have been unscrewed from the elbow and examined. Simply turning the hydrant back to its original position was not in our opinion adequate precautions to take under the circumstances.
Defendant charges that plaintiff was guilty of contributory negligence in that when he became aware the hydrant was leaking he should have known something was wrong and should have reported it to his supervisor without attempting to turn the water off. This contention is refuted by defendant’s own expert engineer, Mr. Haney, who testified that when plaintiff saw the water leaking he acted properly in trying to turn the water off. Defendant also contends that plaintiff was negligent in turning the valve nut counterclockwise but that is the direction it should be turned to shut off the water.
The hydrant in question had three nozzles, one large one called the stemma nozzle, which is used by the Fire Department, and which, when in proper position, faces the street. There are two smaller nozzles, used by the Sanitation Department, which are located one on each side of the hydrant barrel. The hydrant barrel can be turned no more than a quarter turn if the stemma nozzle is struck by a vehicle. The quarter turn causes one of the smaller nozzles to face the street. If the smaller nozzle is struck by a vehicle and the hydrant is turned another quarter turn none of the nozzles are brought to face the street. This renders it impossible for the hydrant to be turned more than half a turn by being struck by vehicles. However even if the hydrant had been unscrewed one-half a *95 turn, the record shows that it is impossible for one man to unscrew it further if the hydrant is in good condition and has been properly installed and maintained.
Even if we assume that the hydrant was unscrewed one-half turn from the tight position and if we assume that it was possible for one man to unscrew it further, plaintiff would have had to make four and one-half turns of the hydrant barrel to unscrew the hydrant, assuming that the threads of the hydrant and the elbow were in perfect condition. But plaintiff only gave the valve nut one-half a turn to the off position and the barrel itself did not turn.
We find no negligence whatever on the part of plaintiff.
We are unable to pinpoint the cause of the hydrant blowing out of the ground. The record contains no direct evidence as to the cause. We agree however with the Trial Court’s finding that the doctrine of res ipsa loquitur is applicable to the facts of the case.
The circumstances under which the doctrine of res ipsa loquitur is applicable are discussed in Great American Indemnity Co. v. Ford, La.App., 122 So.2d 111, and Tassin v. Louisiana Power & Light Company, La.App., 191 So.2d 338 (affirmed by the Supreme Court, 250 La. 1016, 201 So.2d 275). Those cases state that where the accident causing injury occurs, and the instrumentality causing the accident was under the control of the defendant and where the accident is such as would not occur in the ordinary course of things if one having control uses the proper care, the injury is presumed to have been caused by defendant’s negligence and the burden of proof is shifted to defendant to exculpate himself from fault.
Counsel for the Sewerage and Water Board argues in his brief that the doctrine of res ipsa loquitur can not apply where it is shown that the accident might have happened as the result of one of two causes.
We do not agree with counsel that two causes for the accident exist. In our opinion the sole cause of the accident was the negligence of the Sewerage and Water Board in failing to properly maintain the fire hydrant. Being struck by a vehicle or two vehicles in succession would not cause the hydrant to blow out although the hydrant might be damaged internally thereby. While we are unable to determine whether the accident was due to a defective elbow or valve or defective threads the fact remains that any of these possible immediate causes was due to defendant’s negligence in maintaining the hydrant. There exists no causation outside of the defendant’s control that could have caused this accident. Mr. Haney admitted a fire hydrant is a potentially dangerous instrument when improperly seated and as stated by the Supreme Court in Tassin v. La. Power & Light Company, supra: “* * * where the accident is caused by a dangerous instrumentality] the doctrine of res ipsa lo-quitur is particularly applicable * * *.”
The defendant, Sewerage and Water Board, contends that the doctrine of res ipsa is also inapplicable here because it did not have exclusive control of the fire hydrant.
The record shows that the Sewerage and Water Board installed the hydrant in question and that all repairs, inspections and maintenance of the hydrant are its exclusive responsibility.
The fact that the Sanitation Department and the Fire Department are allowed to use the hydrants does not lessen the control factor exercised by the Sewerage and Water Board. The only operation the employees of these departments perform on the hydrants consists in connecting one end of a hose to a nozzle and turning the water on and off. It would be unreasonable to conclude from the exercise of these operations that the Sewerage and Water Board does not have exclusive control of the hydrants.
*96 Having determined that the doctrine applies, the burden shifts to the defendant to show that the accident was caused by something for which it is not responsible. (See Jones v. Shell Petroleum Corporation, 185 La. 1067, 171 So. 447; Brechtel v. Gulf States Elevator Corporation, La.App., 195 So.2d 403; Tassin v. Louisiana Power & Light Company, supra.) We are of the opinion that defendant has failed to establish the cause or a cause which would exonerate it from fault.
Counsel for defendant states in his brief that “The solid jurisprudence is to the effect that in order to hold a municipality for negligence, it must be alleged and proved that the municipality had notice of the defect and failed to repair it within a reasonable time. In this case, there is not a vestige of evidence to show that the Sewerage and Water Board had notice of any defects in this particular hydrant.”
It is also well settled that constructive notice is sufficient and we are of the opinion that defendant had constructive notice of the defects.
As we have seen the Sewerage and Water Board files contain reports indicating that the hydrant in question was struck by vehicles on two occasions—once on December 1, 1961 and again on March 26, 1964. Mr. Haney, Principal Assistant Engineer of the Board, testified that if a hydrant is struck by an automobile it should be checked for damage. Yet the record shows that no check for damage was made on either of the two occasions. All that was done was to turn the hydrant so that the stemma nozzle faced Burgundy Street. As a matter of fact the files of the Board contain no reports showing that the hydrant has ever been checked for damage since its installation.
Plaintiff testified that the stemma nozzle of the hydrant was properly facing Burgundy Street when he approached it to attach his hose indicating that the hydrant had not been struck just prior to the accident, and the absence of any reports indicates that it had not been struck since March 26, 1964.
We conclude from this that the blow out was caused by some defect in the hydrant or by some internal damage caused by being struck on the two occasions reported. The defect or damage could have been discovered and rectified and the accident would not have occurred had the hydrant been properly inspected after being struck. The Sewerage and Water Board had knowledge of the hydrant being struck on two occasions and they must be held to have constructive knowledge of any damage which would have been revealed had the Board not failed in its duty to properly inspect. The Board cannot be permitted to plead lack of notice of defects or damage which would have been discovered had the Board inspected the hydrant, as Mr. Haney testified it should have, after being struck.
Counsel for defendant makes much of the fact that the hydrant had been used by the wash-down crew a night or two before the accident and no one observed a leakage. There is no evidence in the record which would support an inference that the hydrant blew out from any cause other than that it was either defective or was damaged by being struck on the reported occasions. We cannot account for the fact that no leakage was observed the night before the accident other than by theorizing that daily use, of the hydrant under pressure over a period of time could have worsened the undetected damage until it culminated in the blow out.
QUANTUM
Immediately after the accident of August 1, 1964 plaintiff was taken to Mercy Hospital in an emergency crash truck. He remained in Mercy Hospital until August 8, 1964 under treatment by doctors employed by the City of New Orleans (Drs. Tessitore and Gambino). Following his discharge from Mercy Hospital he was given diathermy by Dr. Tessitore approxi *97 mately twice a week until September 16, 1964 when he was discharged as being able to return to work. Dr. Tessitore’s final diagnosis was “severe contusion of lower left chest and upper left abdomen-acute bronchitis.”
Plaintiff testified that during his stay in Mercy Hospital he had severe pains in the stomach, pain in the chest and nausea, and was given demerol for pain. He further testified that after being discharged from the hospital he went home and remained in bed except when he went to Dr. Tessitore’s office for diathermy. While at home he felt dizzy, nauseated, and had continuous pain'in his left side and stomach. He testified that he was still suffering from this condition when Dr. Tessitore discharged him and he decided to see his private physician, Dr. Sam Charles Macaluso, a general surgeon.
Plaintiff saw Dr. Macaluso on September 16, 1964. Dr. Macaluso’s first examination revealed tenderness over the left abdomen and also revealed a discoloration of the lower abdomen. He prescribed codeine, muscle relaxants, diathermy treatments and complete restricted activity. Dr. Macaluso saw plaintiff on Setember 21, 1964 and finding his condition worse decided that hospitalization was necessary. Plaintiff was placed in Touro Infirmary on September 24, 1964 where he remained under Dr. Macaluso’s care until November 5, 1964. During this time plaintiff was given a series of laboratory tests and x-rays were taken. The GI series and the x-rays revealed an esophageal or hiatal hernia.
Dr. Macaluso’s final diagnosis upon plaintiff’s discharge from Touro Infirmary was “severe abdominal wall contusion. Hiatal hernia.” Following plaintiff’s discharge from the hospital Dr. Macaluso prescribed analgesics, muscle relaxants, home heat treatments and restricted activity. Dr. Macaluso saw plaintiff twice a month until May 17, 1965 and finding no improvement in his condition, and because of the continued pronounced pain in the left abdomen decided that an exploratory oper-' ation was necessary. Plaintiff was again admitted to Touro Infirmary on May 17, 1965 with a tentative diagnosis of an inguinal hernia or some obstruction in the abdominal area.
The exploratory operation was performed on May 18, 1965 and revealed a left inguinal hernia which he repaired. Plaintiff remained in the hospital until June 5, 1965. Following discharge from the hospital plaintiff continued to see the doctor approximately twice a month until September 1965 when plaintiff moved to Mississippi. He did not see Dr. Macaluso again until November 27, 1967 for the purpose of a pre-trial examination.
Dr. Macaluso testified that in his opinion both the hiatal and the inguinal hernias were caused by the accident of August 1, 1964.
Plaintiff testified that when he saw Dr. Macaluso in September 1965 just before moving to Mississippi he was still suffering from nausea after eating and Dr. Mac-aluso testified plaintiff’s complaints were compatible with a person suffering from an esophageal hernia.
Defendant vehemently attacks the testimony of Dr. Macaluso and points out that Dr. Tessitore was of the opinion that plaintiff is a malingerer.
The record leaves no doubt in our opinion that plaintiff suffered from an esophageal hernia and also from an inguinal hernia and that both hernias were caused by the accident of August 1, 1964. The inguinal hernia was repaired but plaintiff was still experiencing discomfort from the other hernia at the time of the trial.
The Trial Judge rendered judgment in plaintiff’s favor for $18,058.00 which includes approximately $3,000.00 for hospital and medical expenses. The only question before us is whether the amount of this award is excessive to the extent of being an abuse of the discretion vested in the Trial Court. In our opinion it is not.
*98 The City of New Orleans as plaintiff in reconvention is entitled to judgment in its favor for $2,654.80 workmen’s compensation benefits paid to plaintiff or for his account.
For the foregoing reasons the judgment appealed from is affirmed, costs of this appeal to be borne by defendant-appellant.
Affirmed.